# United States Court of Appeals
## For the First Circuit

No. 99-1122
No. 99-1123
No. 99-1268
No. 99-1335

UNITED STATES OF AMERICA,

Plaintiff, Appellee/Cross-Appellant,

v.

JAMES E. COFIELD, JR., HENRY F. OWENS, III,
OWENS & ASSOCIATES, and ROXSE HOMES, INC.,

Defendants, Appellants/Cross-Appellees.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

_____

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.

_____

Lawrence P. Murray with whom Lane Altman & Owens, LLP was
on brief for Henry F. Owens III and Owens & Associates.
James E. Cofield, Jr. pro se.
Sara M. Bloom, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, Michael J. Pineault,
Assistant United States Attorney, and Thomas W. Rodick, U.S.
Department of Housing and Urban Development, were on brief for
the United States.

June 19, 2000

BOUDIN, Circuit Judge. Roxse Homes housing project is a 364-unit housing development for low- to moderate-income tenants in Boston, Massachusetts. The project was built in 1969 subject to a mortgage insured by the Department of Housing and Urban Development ("HUD"); and it was owned and operated by a non-profit corporation, Roxse Homes, Inc. ("Roxse Homes"), until HUD took over the project in 1992. James E. Cofield, Jr., was the chairman of the board of Roxse Homes from 1971 until 1992 and Henry F. Owens, III, was an attorney who represented Roxse Homes in various matters starting in the early 1970s.

In securing HUD insurance for the mortgage, Roxse Homes signed a regulatory agreement with HUD imposing various restrictions on the company. Pertinently, the agreement provided that

!  Assets of the project may be used only for reasonable operating expenses and necessary repairs of the project;

!  All rents and receipts of the project must be deposited in project accounts; and

!  Documents, records, and other related papers of the project must be maintained in a reasonable condition for proper audit.

From the outset Roxse Homes was unable to make any principal payments on the mortgage, and in 1975 HUD paid the mortgagee $9.5 million and took over the mortgage. In December 1992, HUD secured a court order to replace the management of the project (and HUD later foreclosed on the property). Doubtless prompted by this debacle, government investigators examined the records and transactions of Roxse Homes and ultimately uncovered the two transactions that prompted this litigation.

First, in July and August 1991, Owens received on behalf of Roxse Homes payment of $145,000 in settlement of the project's legal claims against contractors for defective roofing work. Owens first deposited the funds in the Owens & Associates client trust account, and then Owens wrote a check on the trust account for $50,000 payable to the Owens & Associates operating account, with the words "Roxse Retainer" written on the memo line. After audit, the government took the position that Owens had previously been paid in full by Roxse Homes for all of his work on the roofing case and that the $50,000 was not a justified expenditure.

Second, the government's audit revealed that in June 1991, Roxse Homes had paid Owens's firm $13,870.50 out of project funds for legal services on four specific matters. HUD concluded that these amounts, which the project admittedly paid,

were for legal services that benefitted others but not the project. For example, $2,705 was spent on litigation involving the Roxse Homes Limited Partnership and $1,582.50 was spent in opposing subpoenas issued by HUD.

HUD, and ultimately the U.S. Attorney's office, made demands on Cofield and Owens for adequate explanations and/or for the return of the disputed amounts ($50,000 and $13,870.50). More than two years passed with repeated requests by the government, followed by what it regarded as inadequate or inconsistent explanations by Cofield and Owens. In October 1995, the United States filed this suit against Cofield, Owens, Owens & Associates, and Roxse Homes to recover $63,870.50 plus interest, double damages, and costs including attorney's fees. 12 U.S.C. § 1715z-4a (1994).[1] Throughout, we cite and quote the statute as it is listed without amendments made in 1997 which, in any event, do not bear on this case.

This statutory provision empowers the Attorney General to sue in the district court "to recover any assets or income used by any person in violation of . . . a regulatory agreement"

_____

[1]In addition to its statutory claim, the United States made claims of conversion, breach of fiduciary duty and unjust enrichment against the defendants. The district court did not pass on the merits of these common law claims, treating them as superseded by the judgment in favor of the government on the statutory claim.

covering a HUD-insured mortgage or "any applicable regulation."
12 U.S.C. § 1715z-4a(1). The statute further provides:

> For purposes of this section, a use of
> assets or income in violation of the
> regulatory agreement or any applicable
> regulation shall include any use for which
> the documentation in the books and accounts
> does not establish that the use was made for
> a reasonable operating expense or necessary
> repair of the project and has not been
> maintained in accordance with the
> requirements of the Secretary and in
> reasonable condition for proper audit.

Id. § 1715z-4a(a)(1).

The district court conducted a bench trial on the statutory claim and decided it in a memorandum and order dated November 20, 1998. As to the $50,000 payment, the court found that it was not a payment for previously unpaid work in the roofing litigation, that no such unpaid work had been documented by Cofield or Owens, and that the payment was at best an impermissible "retainer" for unspecified work which was reflected in the project's records in a reasonable condition for a proper audit. The court also found that the $13,870.50 paid by Roxse Homes to Owens & Associates out of project funds were not reasonable operating expenses of the project; further detail as to the four transactions is unnecessary because the defendants do not now contest this finding.

Accordingly, the court entered judgment against all defendants for the total amount of $63,870.50 plus $56,180.49 in pre-judgment interest.  The court rejected the government's request for double damages and attorney's fees:  the court noted Cofield's uncompensated years of service to the project and Owens's past recovery in litigation of large sums for the benefit of the project, the absence of fraud charges, and the government's refusal shortly before trial to accept a settlement offer from the defendants for $63,000.  Owens and Cofield have appealed to this court, and the United States has cross-appealed.

Owens makes only a single argument in his brief, although he joins by cross-reference in each of the arguments made by Cofield.  Owens's position is that he does not fit into the category of persons who may be sued under section 1715z-4a. The statute, as already noted, provides that suit can be brought "to recover any assets or income used by any person" in violation of a regulatory agreement or an applicable regulation; and for mortgages like that covering the Roxse housing project, the statute provides:

> [T]he term "any person" shall mean any person or entity which owns a project . . . ; any beneficial owner under any business or trust;  any officer, director, or partner of an entity owning the project; and any heir,

> assignee, successor in interest, or <u>agent of</u>
> <u>any owner</u>.

12 U.S.C. § 1715z-4a(a)(2) (emphasis added).

Owens concedes that he was the attorney for the project in various matters, and therefore its "agent" in a conventional sense. <u>See</u> <u>Kay</u> v. <u>Ehrler</u>, 499 U.S. 432, 435-36 & n.6 (1991). But Owens says that, in context and under the canon <u>ejusdem</u> <u>generis</u>, the term "agent" in this statute is best read as referring to a "managing agent," that is to say, someone who has general responsibility for managing a project; and Cofield urges that the penal character of the statute (notably, provision for double damages) supports a restrictive reading.

While the term "agent" could in context be limited to managing agents, the statute is not so restricted by its terms, and it is easy to think of situations in which agents with narrow responsibility could wrongfully appropriate project funds. Imagine, for example, a purchasing agent who is supposed to acquire supplies for a project but pockets most of the funds for himself. Recovery in such a case seems as easily justified as in the case of an officer or director who takes project property and is perhaps more easily justified than the suit against an owner or director who gained nothing but was simply careless in failing to prevent the theft.

-7-

Here, the expenditures that the district court found to be improper were payments to Owens or his law firm by the project, so Owens's agency responsibilities are clearly implicated. In somewhat similar circumstances, this court treated an attorney as the "agent" of a bank under 18 U.S.C. § 656. United States v. Doane, 975 F.2d 8, 12 (1st Cir. 1992). Of course, there must be some limits based on fault and causation on the notion of agent liability--surely, the purchasing agent cannot be held liable, although an agent of the project, if unbeknownst to him an officer walks off with project rents--but these concerns are not urged on this appeal.

We turn now to Cofield's arguments which he presents pro se. His first argument is a charge that this suit reflects deliberate racial discrimination on the part of the government. Pointing out that both he and Owens are black, he says that the government would not, and has not in the past, asserted similar claims against white directors or agents. According to Cofield, the present suit is selective enforcement in violation of the Equal Protection Clause, Yick Wo v. Hopkins, 118 U.S. 356 (1886), as incorporated in the Fifth Amendment.

In the district court, Cofield asserted a counterclaim against HUD for unlawful discrimination based on selective enforcement. The government says that the counterclaim was

-8-

barred by sovereign immunity (it was dismissed by the district court) and that Cofield never properly asserted discrimination as a "defense" to the government's statutory claim.  This may ask a good deal of a pro se defendant, <u>Haines</u> v. <u>Kerner</u>, 404 U.S. 519, 520-21 (1972) (per curiam); <u>Prou</u> v. <u>United States</u>, 199 F.3d 37, 42 (1st Cir. 1999).  In any event, the court permitted Cofield to offer evidence on the issue at trial and rejected it on the merits, so we treat the claim as preserved.

On the merits, the district court found that the alleged discrepancies in treatment claimed by Cofield were explained by other factors:  in particular, as to the $50,000, that no other law firm had been paid without submitting a bill evidencing the services in question.  Cofield has not shown this finding to be clearly erroneous.  As for the $13,870.50, Cofield's brief contains only general assertions of discrepant treatment and undeveloped references to transcript and document exhibits from which we cannot construct a coherent argument; on the contrary, some of the referenced material helps the government.

It does appear from the transcript that the government acknowledged at trial that at least one other law firm, which worked for the project for approximately 20 years, also billed the project for ineligible expenses and yet was never sued for

recovery of that money. However, the government explained that the amount of ineligible expenses was less than for those billed by Owens and, again, that the other firm was not paid any money without submitting a bill. Moreover, the government submitted evidence at trial that in the bankruptcy court it did oppose fee applications by at least two other law firms. In sum, Cofield has failed to make even a prima facie showing of selective prosecution. See United States v. Graham, 146 F.3d 6, 9 (1st Cir. 1998).

Cofield's second argument concerns the district court's ruling that the $50,000 was not adequately documented in the project records. The crux of the argument is Cofield's claim that "[i]t is implicit in the statute that HUD has to make a request on the project owner for such books, records, and other documents [and] Roxse had no opportunity to make such books, records and other documents available for audit when it was not asked." Cofield's argument might have some merit if he meant that the books and records were properly maintained, and did properly document the $50,000, but were not found because HUD did not ask for them.

The district court found that in fact "the books and records of Roxse Homes do not reflect that Owens & Associates was owed $50,000"; and nothing in Cofield's brief shows this

finding to be clear error.  Cumpiano v. Banco Santander Puerto

Rico, 902 F.2d 148, 152 (1st Cir. 1990).  While a set of project

minutes contains a summary reference by Cofield to the supposed

$50,000 debt for past services, there is no bill from the law

firm and apparently no documentation in the books and records of

the services allegedly performed.  As for the suggestion that a

pre-audit request should have been made, it appears that the

government repeatedly sought documentation but never got it.[2]

Cofield's last argument is that the district court

erred in finding that Owens had already been paid in full for

his work on the roofing case before he obtained the $50,000.

The district court traced in detail the chronology of bills and

payments relating to the roofing case, and it found that all of

Owens's bills on that case had been paid.  Further, an earlier

affidavit by Cofield said that the $50,000 was a retainer, as

did Owens's check memo.  Finally, there was no credible evidence

from Owens that any specific piece of uncompensated work had

been done on the roofing case.

---

[2]Since there is no indication that Owens was responsible for
the project books and records, Owens's liability for the $50,000
rests more securely on the district court's finding that he had
already been compensated for his work on the litigation.  As for
the $13,870.50, the district court did not rest on a lack of
records but rather on the conclusion that Cofield approved, and
Owens received, payment for inappropriate expenditures.

Cofield says that the district court conceded that there was "a lot of evidence" that Owens provided legal services for his $50,000 payment; but the only evidence specifically mentioned by the court was the minutes that summarily mentioned the supposed $50,000 debt and a memorandum by Cofield preliminary to the meeting--neither of which gave any detail as to services. In sum, the district court provided a plausible explanation for its conclusion, and again Owens has not shown that the finding was clear error.

This discussion disposes of Owens's and Cofield's direct challenges of the judgment entered against them, but that does not end the matter. Section 1715z-4a(c) provides that:

> In any judgment favorable to the United States entered under this section [section 1715z-4a], the Attorney General may recover double the value of the assets and income of the project that the court determines to have been used in violation of the regulatory agreement or any applicable regulation, plus all costs relating to the action, including but not limited to reasonable attorney and auditing fees.

The government has cross-appealed from the district court's refusal to grant it double damages or attorney's fees.

Starting with attorney's fees, the statutory language is not very informative: it does not say that attorney's fees "must" or "shall" be awarded but, contrariwise, it does not make an award of attorney's fees explicitly subject to the court's

-12-

discretion.  <u>Compare</u> 42 U.S.C.A. § 1988(b) (Supp. 2000) ("the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs").  Nor is there any pertinent legislative history or circuit court precedent that helps us in glossing section 1715z-4a(c) as applied to attorney's fees.

However, the Supreme Court has interpreted the language of section 1988 to require attorney's fees "save for rare cases in which 'special circumstances' would render an award unjust." <u>Stanton</u> v. <u>Southern Berkshire Reg'l Sch. Dist.</u>, 197 F.3d 574, 576 (1st Cir. 1999).  The wording of section 1715z-4a(c) is even more favorable to recovery of attorney's fees than the language of section 1988(b).  Although many of the statutes to which the special circumstances test has been applied are civil rights statutes, the courts have applied the test in other contexts as well.  1 Derfner & Wolf, <u>Court Awarded Attorney Fees</u> § 10.02, at 10-11 n.10 (1999).  The key decisions are <u>Blanchard</u> v. <u>Bergeron</u>, 489 U.S. 87, 89 n.1 (1989), <u>Hensley</u> v. <u>Eckerhart</u>, 461 U.S. 424, 429 (1983), and <u>Newman</u> v. <u>Piggie Park Enterprises, Inc.</u>, 390 U.S. 400, 402 (1968).

The Supreme Court's rationale for the special circumstances test is that Congress meant to encourage such lawsuits, because of their public purpose.  <u>See generally</u> <u>Piggie</u>

Park, 390 U.S. at 401-03. It is similarly clear, from the legislative history of the amendment to section 1715z-4a providing for double damages and attorney's fees, that Congress meant to encourage more enforcement by federal authorities, H.R. Rep. No. 100-122(I), at 66 (1987), reprinted in 1987 U.S.C.C.A.N. 3317, 3382. And incentives aside, in all cases the award of attorney's fees tends more completely to make the injured party whole.

Accordingly, we think that the "special circumstances" test is the proper standard in this case. It effectively creates a strong presumption in favor of awarding attorney's fees. See Posada v. Lamb Cty., Texas, 716 F.2d 1066, 1075 (5th Cir. 1983). The burden is on the defendant to show that unusual conditions would make an award unjust or inappropriate. See Herrington v. County of Sonoma, 883 F.2d 739, 744 (9th Cir. 1989). Here, in explaining its denial of attorney's fees, the district court said only this:

> Before trial began, the defendants offered to settle this case for $63,000, the stated amount in the government's Complaint. Rather than accept this offer, the government embarked on a nine-day trial to recover the interest on the money. No private litigant would spend nine days in trial solely to recover interest. The Court sees no reason to reward such tactics, which are only possible because of the government's unlimited resources.

-14-

We do not think that the government's refusal to settle, standing alone, constitutes "special circumstances." See Coutin v. Young & Rubicam Puerto Rico, 124 F.3d 331, 341 (1st Cir. 1997). There was nothing whatever unreasonable or unfair in the government's decision to reject the defendants' offer, which was made only on the eve of trial and after the government had invested in trial preparation. Since the defendants' offer did not include pre-judgment interest or double damages, the defendants were belatedly offering to settle for only about one-third of what the government might hope to collect.

The district court's denial of double damages raises a different set of issues. Again, the statute does not say that double damages must or shall be provided. Compare 15 U.S.C. § 15a ("[T]he United States . . . shall recover threefold the damages by it sustained and the cost of the suit."). Further, double damages are not required to make a plaintiff whole nor, where the government can collect its full costs including attorney's fees, are double damages likely to be a critical incentive for bringing suit. Rather, as the legislative history confirms, the double damages provision was adopted simply to provide a greater "deterrent" to violations. H.R. Rep. No. 100-122(I), at 66 (1987), reprinted in 1987 U.S.C.C.A.N. 3317, 3382.

-15-

The violations that give rise to liability under section 1715z-4a are broadly defined, and perhaps ill-defined, by cross-reference to a "regulatory agreement" or "any applicable regulation." If the present Roxse Homes agreement is typical, such agreements include phrases like "reasonable operating expenses" and books and records kept in "reasonable condition for proper audit," which give rise to further uncertainty in their application to particular circumstances. An added problem is the lack of clarity in the statute as to what level of scienter, if any, is required for a violation and what causal connection must be shown between the violation and any claimed loss.

These concerns encourage us to leave to the informed judgment of the district court the decision whether the award of double damages is just in the particular circumstances. Imagine, for example, that Owens had in fact performed services and properly billed for the $50,000, but in a retrospective evaluation the payment was found by a close margin to be an "unreasonable" operating expense of the project; or suppose that payment of a plausible bill was authorized by Cofield in good faith but the documentation was later found not quite sufficient. Recovery of loss and costs is one thing; a double damages penalty is quite another.

Double damages for the government on a deterrence rationale make sense primarily where the defendant is guilty of substantial or repeated fault. Cf. Ocean Spray Cranberries, Inc. v. Pepsico, Inc., 160 F.3d 58, 62 n.3 (1st Cir. 1998) (discussing Mass. Gen. Laws ch. 93A). There is obviously a spectrum, with fraudulent intent or recklessness at one end and a lost record or close-call judgments at the other. The district court may have felt that the defendants, after many years of service, were no worse than careless in the transactions in question. If so, we would regard this as an adequate basis for the court to exercise its discretion to deny double damages--although we do not suggest that seriously negligent acts could never justify double damages.

Nevertheless, we think that the government is entitled, under the law as we have clarified it, to an opportunity to persuade the district court that the conduct of the defendants reflects sufficient fault to warrant double damages despite the defendants' past services. The district court is entitled to limit the inquiry: double damages is a remedial measure and not the occasion for a second trial. Relatedly, defendants can dispute the award of attorney's fees on new grounds if they choose, but at present no basis for refusing to impose them is apparent to us.

The judgment is <u>affirmed</u> as to the recovery by the government of $63,870.50 plus interest from the defendants. Insofar as it denied double damages and costs including attorney's fees, the judgment is <u>vacated</u> and the matter <u>remanded</u> for further proceedings consistent with this opinion.

<u>It is so ordered</u>.