IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-10562
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

        versus


RETIREMENT SERVICES GROUP;
JOHNNIE BENSON, Individually;
JUDY CORBEILLE, Individually;
JACQUELINE BENSON UNGERLEIDER,
Individually; RETIREMENT VILLAGES
MANAGEMENT INC., doing business
as Heritage Village, doing business
as Colonial Southwest Inc;
COLONIAL SOUTHWEST INC;

                                        Defendants-Appellants.


_____

Appeal from the United States District Court
for the Northern District of Texas
_____

August 15, 2002

Before GARWOOD, JOLLY and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

    Defendants-Appellants Retirement Services Group (RSG), Johnnie

Benson (Benson), Judy Corbeille (Corbeille), Jacqueline Benson

Ungerleider (Ungerleider), Retirement Villages Management, Inc.

(Retirement Villages), and Colonial Southwest, Inc. (Colonial) (collectively the appellants) appeal the district court's entry of summary judgment in favor of Plaintiff-Appellee United States Department of Housing and Urban Development (HUD). We reverse and render judgment in part and vacate and remand in part.

## Facts and Proceedings Below

RSG, a Texas general partnership, owned Heritage Village, a retirement community in Fort Worth. The Heritage Village project had been financed with a $6.5 million mortgage loan insured by HUD. Benson owned seventy-six percent of RSG. According to the stipulated facts, the remaining twenty-four percent of RSG was owned by a trust; the trust and Benson were the only partners of RSG. Benson was the sole trustee of the trust; Corbeille and Ungerleider, Benson's adult daughters, and Delvoris Davis were the named beneficiaries of the trust. Benson acted as general manager of RSG. Retirement Villages, doing business as Colonial, was the project manager.

The $6.5 million loan was issued from Carnegie Evans Corporation, a private lender. As a guarantee for the mortgage obligation, Carnegie Evans Corporation secured co-insurance from HUD on or about February 9, 1988, pursuant to Sections 244 and 233(f) of the National Housing Act as amended (12 U.S.C. §§ 1715z-9, 1715n(f)). HUD would provide the lender with insurance coverage for losses up to approximately eighty percent of unpaid

2

principal and interest if the borrower should default, subject to various conditions and limitations.  On February 9, 1988, RSG executed a deed of trust note and a deed of trust in favor of the lender.  Also on February 9, 1988, RSG entered into a Regulatory Agreement with HUD in consideration of HUD's agreement to co-insure the mortgage loan.  The Regulatory Agreement was signed by Benson in her capacity as general manager of the partnership.

Heritage Village was not profitable and, on April 1, 1990, the mortgage went into default.  On or about March 19, 1991, the beneficial interest under the note and the deed of trust lien were assigned to the Secretary of HUD.  On or about September 30, 1993, HUD foreclosed on the mortgage.

Under HUD regulations then in effect, a mortgagor generally was permitted to expend project funds only for payment of mortgage obligations and payment of reasonable expenses necessary to the proper operation and maintenance of the project.  24 C.F.R. § 255.704(b) (1989).  The project owner could make distributions of surplus cash only when all mortgage payments are current and the owner is in compliance with all other conditions. 24 C.F.R. § 255.705(a) (1989).  Owners were also required to maintain books and records in reasonable condition for proper audit and in compliance with HUD requirements.  24 C.F.R. § 255.706(e)-(g) (1989).  Owners were required to provide monthly accounting reports and year-end financial statements audited by

3

an independent certified public accountant.  24 C.F.R. § 255.706(g) (1989).  If the owner makes unauthorized distributions of project funds, HUD can recover double the value of the assets and income of the project that have been used in violations of the regulations or the regulatory agreement, plus costs.  12 U.S.C. § 1715z-4a(c).

In 1991, HUD contracted with Ervin and Associates (Ervin) to monitor the Heritage Village project's finances and report back to HUD.  Holly Larisch was the asset manager for Ervin with the primary responsibility for monitoring Heritage Village and reporting back to HUD.  In a quarterly update dated September 27, 1991, Larisch included a reference to equity skimming, noting that "receivables are due from affiliates of the general partner and manager."  In an update dated December 31, 1991, Larisch stated that reports received for the period from the date of the default through November 1991 "show a significant amount of equity skimming."  In a memorandum dated January 6, 1992, Larisch indicated that she had talked about equity skimming with Ray Carson, the director of HUD's Fort Worth Multifamily Program Center.  There appears in the record a draft letter from Larisch to Marshall Day, Benson's attorney, dated April 20, 1992, in which Larisch explicitly accuses Benson of equity skimming.  The draft letter is attached to a fax cover page, which indicates that the draft letter was faxed from Larisch to Carson on April

4

21, 1992.  A handwritten notation on the cover page solicits Carson's comments on the letter.  Another notation on the page, in what appears to be different handwriting, states "Don't think this was sent."  ("This" appears to refer to the draft letter to Day rather than the fax to Carson.  The machine-printed header of the cover page indicates that the fax was transmitted from Ervin on April 21, 1992.)

Throughout 1991 and 1992, Ervin and HUD made repeated requests for RSG to submit properly prepared audited financial statements and monthly accounting reports.  On August 3, 1992, HUD sent a letter to RSG requesting additional documentation and explanation of questionable project expenditures.  Because RSG failed to respond properly, on August 11, 1992, HUD requested the HUD Office of Inspector General for Audit (the HUD OIG) to perform an audit of the project because HUD suspected that equity skimming had occurred before and after the mortgage went into default.  In December 1992, HUD conferred with Benson and, according to HUD in a confirming letter dated December 23, RSG agreed to respond to HUD's August 3 letter and to reimburse the project for all monies used that were not for reasonable and necessary operating expenses of the project.  RSG's response was supposed to include invoices and other supporting information. RSG never responded except by providing the same annual financial statements that HUD had previously deemed unacceptable.

On December 9, 1992, the HUD OIG authorized an audit. The HUD OIG began the audit in January 1993. A draft audit was prepared and forwarded to HUD on *or about* June 17, 1993.[1] A final audit report was dated August 13, 1993. The audit concluded that Benson used $841,106 of project funds for unauthorized disbursements to herself, her partners, and for other improper or unsupported costs. The final audit report's footnote 1 explains that the actual amount of unauthorized costs was $864,521 and that this figure was adjusted by $23,417 because Benson had reimbursed Heritage Village up to that amount. The figures included in the final audit report were apparently unchanged from those in the draft audit report.[2]

The audit covered transactions related to the Heritage Village project for the period February 9, 1988 through December

---

[1]As we will explain, this "or about" becomes important to our holding.

[2]The parties seem to agree that there was no alteration in the total unauthorized cost amount between the August 13, 1993 final audit report and the June 1993 draft audit report. The June 1993 draft audit report is not in the record. However, the record does contain evidence in the form of affidavits from E. Ross Burton, the Director of Housing Loan Management in HUD's Fort Worth Regional Office, and Jerry Thompson, the Assistant District Inspector General for Audit for the Southwest Region of the HUD OIG, both of which state that the draft audit report identified $841,106 in unauthorized distributions. The record also contains an internal memorandum from HUD's files dated May 14, 1993. The computer-printed header of this document includes the phrases "External Audit" and "Heritage Village." The body of the one-page document includes handwritten notations stating that the purpose of the document was to "Display Results of Audit" and "owner disbursed $864,521.82 on quest. costs." This document does not indicate its author or any recipients.

31, 1992.  The audit report states that the field work for the audit was completed during December 1992 through April 30, 1993.

HUD filed suit against the appellants on June 17, 1999 in the United States District Court for the Northern District of Texas,  seeking double damages for misused assets pursuant to 12 U.S.C. § 1715z-4a or, alternatively, relief for alleged violations of 31 U.S.C. § 3713 (pertaining to priority of government claims).  On January 31, 2000, the appellants filed a motion for summary judgment alleging that HUD's case was barred by the applicable six year statute of limitations contained in 14 U.S.C. § 1715z-4a(d).  The district court denied this motion on March 24, 2000.  In December 2000, HUD filed a motion for summary judgment and the appellants filed a second motion asserting the limitations defense, this time relying on newly obtained documents.  On February 26, 2001, the district court denied the appellants' second motion for summary judgment and granted HUD's motion for summary judgment.  The district court held that the limitations period did not begin to accrue until August 17, 1993, the date the final audit report was submitted.[3]  Final judgment was entered in favor of HUD on February 26, 2001, ordering the appellants to pay $1,682,212 plus interest.  (Pursuant to 12 U.S.C. § 1715z-4a(c), the  total of $841,106 in improper

_____

[3]The final audit report appears in the record and is actually dated August *13*, 1993.

7

expenditures indicated by the audit was doubled to arrive at the final judgment figure of $1,682,212.)  The district court held that all the appellants, including Corbeille and Ungerleider, were jointly and severally liable for the entire amount of the judgment.

On appeal, the appellants assign as error the district court's holding on the statute of limitations issue.  The appellants argue that HUD discovered the equity skimming prior to June 17, 1993, six years before HUD filed suit.  Before this court, HUD concedes that it discovered improper expenditures no later than the date of the *draft* audit report, rather than the date of the final audit report as the district court held.  HUD also concedes that the draft audit report was prepared no later than June 17, 1993.  The appellants also argue, in the alternative, that Corbeille and Ungerleider should not be held liable for the entire amount of the judgment because they were not general partners in RSG.

**Discussion**

1. Standard of Review

This court reviews a district court's grant of summary judgment *de novo*. *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996). Summary judgment is proper if, after adequate opportunity for discovery, the pleadings, depositions, answers to interrogatories, and admissions on file, together with

8

any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2511 (1986). The moving party bears the burden of identifying an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2554 (1986). Summary judgment is properly granted if the record does not contain appropriate summary judgment evidence which would sustain a finding in the nonmovant's favor on any issue as to which the nonmovant would bear the burden of proof at trial. *Id*. at 2552-53.

2. The Limitations Issue

12 U.S.C. § 1715z-4a(d) provides:

"(d) Time limitation. Notwithstanding any other statute of limitations, the Secretary may request the Attorney General to bring an action under this section at any time up to and including 6 years after the latest date that the Secretary discovers any use of project assets and income in violation of the regulatory agreement, or such other form of regulatory control as may be imposed by the Secretary, or any applicable regulation."

The interpretation of this limitations provision is an issue of first impression in this circuit. The appellants argue that the limitations period began to run before June 17, 1993, because HUD suspected equity skimming long before that date. HUD urges an interpretation that would start the limitations period running on the day that HUD confirmed the existence of equity skimming by

9

means of an audit. HUD concedes that the date of the *draft* audit report was the latest date that the limitations period could begin to accrue, even under HUD's interpretation. Therefore, if the draft audit report was actually completed *before* June 17, 1993, HUD's suit would clearly be time-barred.

A statute of limitations defense is an affirmative defense, Fed. R. Civ. P. 8(c), and thus the burden was on the appellants to create a genuine issue of material fact regarding when HUD had sufficient knowledge to start the limitations period running. We hold that the appellants have met this burden and that a genuine issue of material fact exists as to when HUD discovered the equity skimming.

Before this court, HUD has consistently asserted that the draft audit report was issued on June 17, 1993. The record, however, is inconsistent on this crucial point. The record reveals that there was a stipulation, agreed to by all parties and approved by the district court, to the effect that the draft audit report was issued on June *13*, 1993.[4] If the stipulated date is correct, then HUD's action is time-barred since HUD concedes that it discovered the equity skimming no later than the day the draft audit report was issued. "The trial court may

---

[4]The stipulation is contained in a statement of stipulated facts in the Amended and Corrected Joint Pretrial Order entered by the district court on December 12, 2000. This order was signed by counsel for each party and by the district judge.

10

disregard stipulations between parties only if accepting them would be manifestly unjust or if the evidence contrary to the stipulation was substantial." *Hymel v. Commissioner*, 794 F.2d 939, 940 (5th Cir. 1986) (*per curiam*) (internal quotation marks omitted). There is some evidence in the record that contradicts the stipulated date. Burton's affidavit, dated March 1, 2000, states that the draft report was issued "on June 17, 1993." Thompson's affidavit, dated December 21, 2000, states that the draft report was issued "on *or about* June 17, 1993" (emphasis added).[5]

Comparing the clear language of the stipulation with the clear language of Burton's affidavit and the equivocal language of Thompson's affidavit creates a genuine issue of fact as to whether the draft audit report was issued on June 17, 1993 or before that date. This fact issue is material because a finding that the report issued prior to June 17, 1993 – as the stipulated facts indicate it was – would establish that HUD's suit was time-barred. Burton's affidavit supports HUD's concession that the date the draft audit report issued was the latest possible date on which the limitations period began to accrue. Burton, the Director of Housing Loan Management for HUD's Fort Worth Regional Office, stated in his affidavit "[P]rior to the HUD OIG Audit

---

[5]We also take judicial notice of the fact that June 13, 1993 was a Sunday.

11

Report, we did not have sufficient information to draw conclusions about the propriety of the questioned disbursements." Burton continued, "It was not until the HUD OIG issued its draft audit report . . . to both the owner and HUD that it was confirmed to me that the previously questioned project disbursements were in fact not reasonable expenses necessary for the operation of the project.  The Audit Report informed me of the following: The owner used project funds of $841,106 for unauthorized distributions . . . ."  *Id.*

Because we find that the limitations period began to run no later than the date of the draft audit report and because there is a genuine issue of material fact as to what that date was, we vacate the district court's summary judgment holding that the limitations period began to run on August 17, 1993 and remand this case for further proceedings.  If it is established that the draft audit report was issued before June 17, 1993, then judgment should be entered in favor of the appellants.  If, however, it is established that the draft audit report was issued on June 17, 1993, there will likely be issues of material fact remaining. For example, it seems highly likely to us that, if the draft audit report was issued on June 17, that *someone* at the HUD OIG was most probably aware of the contents of the report by June 16. Whether someone did in fact have such knowledge on June 16, who that someone was, and whether his position was sufficiently

12

senior that his knowledge could be attributed to the Secretary would all be material issues of fact.

Our research has disclosed no circuit court cases interpreting the limitations provision in Section 1715z-4a(d). There are at least four published opinions in which district courts have analyzed Section 1715z-4a(d). Their reasoning provides useful guidance for our analysis. We summarize their relevant holdings briefly. *United States v. Flake*, 783 F. Supp. 762 (E.D.N.Y. 1992) addressed the question of who must have knowledge in order to attribute a discovery to "the Secretary" of HUD.[6] Relying in part on this court's application of agency principles in *United States v. Currency Totalling $48,318.08*, 609 F.2d 210, 214 - 15 (5th Cir. 1980), *Flake* held that the limitations period began to run when "a senior administrator learns of a transfer of HUD funds to another entity and has a duty to share this knowledge with his superior." *Flake*, 783 F. Supp. at 767. In *United States v. Harvey*, 68 F. Supp. 2d 1001 (S.D. Ind. 1997), HUD asserted that it was unaware that certain payments were improper until after an audit had been performed. Summary judgment was precluded because there was a genuine issue of material fact as to whether HUD needed to perform the audit

---

[6]We note that none of the parties to the instant case have argued that the individual holding the cabinet position of HUD Secretary must have personal knowledge in order to start the statute of limitations running.

13

before it could become aware that the payments were improper. *Id.* at 1008. After a bench trial, the court made the factual finding that HUD was unable to determine that these payments were improper until after it received the audit. *United States v. Harvey*, 68 F. Supp. 2d 1010, 1013 (S.D. Ind. 1998). In *United States v. Schlesinger*, 88 F. Supp. 2d 431 (D. Md. 2000), the court held that, on the facts of that case, HUD did not discover the unauthorized expenditures before it *began* auditing the project, *id.* at 439.[7] *United States v. Envicon Dev. Corp.*, 153 F. Supp. 2d 114 (D. Conn. 2001), held that HUD must have *actual* knowledge, rather than merely constructive knowledge, of improper expenditures before the limitations period began to run. *Id.* at 122-23. This interpretation accords with the well-established principle that "[s]tatutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government." *Badaracco v. Commissioner*, 104 S.Ct. 756, 761 (1984); *see also Davidson v. FDIC*, 44 F.3d 246, 249 (5th Cir. 1995) (same); *but see Franconia Assocs. v. United States*, 122 S.Ct. 1993 (2002) ("[L]imitations principles should generally apply to the Government in the same way that they apply

---

[7]The *Schlesinger* court did not adopt a *per se* rule with respect to audits. In that case, the only evidence of prior discovery proffered by the defendant clearly did not support an inference that HUD was aware of the improper transactions before it began the audit. *See id.* at 439.

to private parties." (internal quotation marks omitted)). [8]

"Discovers," as used in Section 1715z-4a(d), must mean something more than to suspect but something less than to confirm with absolute certainty as to all the possibly material details. In *Mahar v. Strachan Shipping Co.*, 68 F.3d 951 (5th Cir. 1995), we interpreted an ERISA limitations provision that started the limitations period running when the plaintiff "had actual knowledge of the breach or violation," *id.* at 952 (quoting 29 U.S.C. § 1113(2)(A)). We explained that actual knowledge "requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim . . . ." *Id.* at 954 (quoting *Int'l Union v. Murata Erie North America*, 980 F.2d 899,

---

[8]The *Envicon* court also commented on the meaning of "latest date": "The court takes the 'latest date' to mean the date the Secretary receives documentation or other information or notice revealing the 'any use of project assets and income in violation of the regulatory agreement.' An interpretation of 'latest date' that allowed the Secretary to effectively push back the date for filing each time HUD discovered additional evidence of the same violation would frustrate the purpose of having a statute of limitations." *Envicon*, 153 F. Supp. 2d at 121.

In the instant case, HUD has raised arguments relying on the "latest date" language. Our disposition of this case does not require us either to accept or reject the interpretation of this language developed in *Envicon*. It is clear from the evidence and HUD's admissions that the absolute "latest date" HUD could have discovered any improper use of assets was the date on which the draft audit report was issued, whether that was June 17, 1993 or before. All of the improper expenditures that HUD alleges in this suit were included in the final audit report which, apparently, did not include any such expenditures that were not included in the draft audit report.

15

900 (3d Cir. 1992)).  "To charge the Secretary [of Labor] with actual knowledge of an ERISA violation, it is not enough that he had notice that something was awry; he must have had specific knowledge of the actual breach of duty upon which he sues." *Brock v. Nellis*, 809 F.2d 753, 755 (11th Cir. 1987); *Mahar*, 68 F.3d at 955 (quoting *Brock* with approval).  Of course, the language of the ERISA limitations provision differs significantly from the limitations provision we interpret here.  But we find these precedents instructive in a general way for informing our understanding of Section 1715z-4a(d), since a strict construction in favor of the government requires us to understand "discovers" to require some degree of actual knowledge.  *Cf. Shellmar Products Co. v. Allen-Qualley Co.*, 87 F.2d 104, 108 (7th Cir. 1937) (defining "discover" as "to get knowledge of what has existed but has not theretofore been known to the discoverer.").  HUD concedes that it had the requisite actual knowledge – both of the events that occurred and that they supported HUD's claim of a violation – *no later than* the issuance of the draft audit report. The district court erred by holding that HUD did not have the requisite knowledge until the August 1993 date of the final audit report.       Our disposition of this case does not require us to go any further in interpreting Section 1715z-4a(d) at this time.  Based on the evidence in the record, it is possible that the draft audit report was issued before June 17, 1993.  It is

16

perhaps probable, even if the draft audit report was not issued until June 17, 1993, that a senior HUD administrator with a duty to report had actual knowledge of the violations reflected in the draft audit report prior to June 17, 1993.  The appellants will have the burden of proving one of these possibilities on remand. We make no prediction as to whether the appellants will ultimately succeed in meeting this burden.[9]  But the appellants have succeeded in raising a genuine issue of material fact that precludes summary judgment on the limitations issue.

3. The Liability Issue

The appellants have also succeeded in raising what are at least genuine issues of material fact relating to the liability of defendants Corbeille and Ungerleider.

12 U.S.C. § 1715z-4a(a) describes what parties may be held liable for the types of violations that HUD alleged in the instant case.  In pertinent part, Section 1715z-4a(a) provides:

> "The Secretary . . . may request the Attorney General to bring an action in a United States district court to recover any assets or income used by any person in violation of (A) a regulatory agreement that applies to a multi-family project whose mortgage is insured or held by the Secretary under Title II of the National Housing Act . . . or (D) any applicable regulation. . . . (2) For purposes of a mortgage insured or held by the Secretary under Title II of the National Housing Act . . . the term "any person" shall mean any person or

---

[9]We note that if appellants make an appropriate preliminary showing, HUD may arguably have some burden to come forward with evidence as to matters particularly within its own knowledge and control. *See, e.g., McCormick on Evidence* (West; 3rd Ed. 1984) § 337 at 950.

entity which owns a project, as identified in the regulatory agreement, including but not limited to any stockholder holding 25 percent or more interest of a corporation that owns the project; any beneficial owner under any business or trust; any officer, director, or partner of an entity owning the project; and any heir, assignee, successor in interest, or agent of any owner."

It is undisputed that RSG, an entity and a Texas general partnership, was the sole owner of the Heritage Village project and the Regulatory Agreement identifies RSG as such. It is also undisputed that defendant Benson was a general partner of RSG. On appeal, the appellants challenge only the potential liability of Corbeille and Ungerleider, not that of Benson or any of the other defendants (RSG, Retirement Villages, and Colonial).[10]

HUD argues that Corbeille and Ungerleider may be held liable on either of two primary theories – that they were general partners of RSG or that they were beneficial owners of a trust that was a partner of RSG.[11] The application of Section 1715z-

---

[10]Of course, if the appellants' statute of limitations defense succeeds it would establish that none of the defendants can be held liable as the entire suit is time-barred. The appellants concede that the evidence supports HUD's claim that the equity skimming actually occurred. Thus, if the limitations defense fails, the remaining question would be which of the defendants can be held liable for the judgment.

[11]HUD also asserts, without citing evidence in the record, that Corbeille and Ungerleider would also be liable as "officers of the project's identity of interest management agent, Colonial Southwest." Corbeille testified in her deposition that she served as secretary of Colonial and, in their brief to this court, the appellants accept the characterization that she was an officer of Colonial. The analysis for the officer theory of liability is the same as that for the beneficial owner theory, so we need not discuss it separately.

18

4a(a) to the instant case presents issues of first impression in this circuit. We will discuss the statute's application to each of the theories of liability.

If RSG is found to have misused assets or income in the manner specified by Section 1715z-4a(a), the plain language of the statute authorizes a judgment against RSG. RSG is an "entity which owns a project" and falls within the definition of "any person" that may be held liable. *Id.* Because RSG is a Texas general partnership, any general partner of RSG, subject to certain exceptions, will be jointly and severally liable for the judgment by application of the general principles of Texas partnership law. *See* Tex. Rev. Civ. Stat. Ann. art. 6132b-304 (Vernon 2002).[12] If it were established that Corbeille and Ungerleider were general partners of RSG, that finding would settle this issue in favor of HUD.

In the Amended and Corrected Joint Pretrial Order, the parties made the following stipulation:

> "The Defendants Judy Corbeille and Jacqueline Ungerleider were two of the three beneficiaries of the *Trust that owned 24 percent* of Retirement Services Group at the time of the execution of the Deed of Trust and Regulatory Agreement. Defendant Johnnie *Benson* was the Trustee of this Trust and *owned 76 percent* of Retirement Services

---

[12]We are aware that the definition of "any person" in Section 1715z-4a(a)(2) includes "any . . . partner of an entity owning the project." As applied to the instant case, this part of the definition would include the trust. No judgment was entered against the trust, or against Benson as trustee, and indeed neither the trust nor Benson as trustee was a party to the case.

19

Group." (emphasis added).

According to this stipulation, RSG had only two partners – who together owned 100 percent of the partnership – Benson and the trust. (A trust is a "person" that can be a partner. *See* Tex. Rev. Civ. Stat. Ann. art. 6132b-101(14), 6132b-2.02(c) (Vernon 2002).) "The trial court may disregard stipulations between parties only if accepting them would be manifestly unjust or if the evidence contrary to the stipulation was substantial." *Hymel*, 794 F.2d at 940 (internal quotation marks omitted).

In their depositions, Corbeille and Ungerleider testified that they never owned an equity interest in RSG or any of the entities named as defendants. However, in their original answer to HUD's complaint, the appellants admitted that Corbeille and Ungerleider *were* general partners of RSG. HUD's complaint contains the following allegations: "7. Defendant Judy Corbeille, individually, is for all relevant times a general partner of Retirement Services Group. 8. Defendant Jacqueline Benson Ungerleider, individually is for all relevant times a general partner of Retirement Services Group." The appellants made the following answer to these paragraphs: "7. Defendants admit the allegations contained in paragraph 7 of the Complaint. 8. Defendants admit the allegations contained in paragraph 8 of the complaint."

But the record contains a document entitled "Amendment to

20

Partnership Agreement," dated May 1, 1985, which describes the ownership of the partnership interest as follows: "a. Johnnie Benson – 76% b. Johnnie M. Benson, Trustee for Jacqueline Benson Ungerleider, Judy Benson Corbeille, and Delvoris D. Davis – 24%." The deposition testimony of both Corbeille and Ungerleider is consistent with this description of the partnership.[13] The admissions are the only evidence offered by HUD to contradict the stipulation. In light of the evidence that corroborates the stipulation, the admissions are not substantial enough to overcome the presumption in favor of accepting the stipulated facts. Without substantial evidence contradicting the stipulation or a showing of manifest injustice (which HUD has not argued), Corbeille and Ungerleider cannot be held personally liable as general partners. The judgment against those defendants cannot stand on that basis.

As far as the record reflects, the appellants have never denied that Corbeille and Ungerleider were two of the three beneficiaries of the trust that, per the stipulation, is a general partner of RSG. Indeed, on appeal, the appellants urge that Corbeille and Ungerleider be characterized as beneficiaries of the trust, rather than as general partners of RSG. Section

---

[13]In particular, Corbeille testified that she, Ungerleider and Davis, were beneficiaries of the trust, which owned 24 percent of RSG and that she understood this to mean that the three beneficiaries were not partners but were "part of a trust that together had eight, eight and eight for a total of 24 percent."

21

1715z-4a(a)(2) includes in its definition of "any person" who may be sued "any beneficial owner under any business or trust." HUD argues that Corbeille and Ungerleider, as beneficial owners of the trust, would thus be strictly liable for the judgment against RSG even if they were not general partners of RSG. The appellants assert that Corbeille and Ungerleider, as beneficial owners, may only be held liable if there is a showing of wrongdoing by them as individuals. Some interpretation of Section 1715z-4a(a)(2) is necessary to clarify what facts are material.

HUD's contention is essentially that the statute's plain language – by including a beneficial owner in the definition of "any person" – establishes that Corbeille and Ungerleider were properly held liable. This court will follow the literal, plain language of a statute unless doing so would lead to an absurd result. *E.g.*, *Johnson v. Sawyer*, 120 F.3d 1307, 1319 (5th Cir. 1997). Applying this well-established principle, we observe first that the plain language of Section 1715z-4a(a), taken with absolute literalness, is not entirely clear. To begin with, Section 1715z-4a(a)(1) authorizes the Attorney General "to bring an action . . . to recover any assets or income used by any person." Taken literally, the section does not specify *against whom* such an action may be brought or *from whom* HUD can recover. It would clearly be an absurd result if the statute permitted a

person with no connection whatsoever to the project in question to be named as a defendant. The determination of who may be sued must be informed by the rest of the statute, especially the phrase "used by any person" and the definition of "any person." *See United States v. Cofield*, 215 F.3d 164, 168 (1st Cir. 2000) (interpreting definition of "any person" to determine whether defendant was a person who could be sued).

Section 1715z-4a(a)(2)'s definition of "any person" narrows the sphere of possible defendants to "any person or entity which owns a project, as identified in the regulatory agreement," which includes "any beneficial owner under any business or trust." To again avoid an absurd result, we must regard "any business or trust" as encompassing only a business or trust with a connection to the project in question. *Cf. Cofield*, 215 F.3d at 168 (interpreting "agent of any owner," as used in Section 1715z-4a(a), as referring to an agent with some responsibility connected to the project). So, the beneficial owner of a trust that owns the project is a person from whom HUD can recover in an action by the attorney general. The statute's wording requires us to take one further step to determine *what* HUD may recover. The statute authorizes a legal action "to recover any assets or income *used by* any person in violation of . . . ." 12 U.S.C. §

23

1715z-4a(a)(1) (emphasis added).[14] For a "person," as defined by the statute, to be liable it must be shown that the person "used" (indeed, that the person *mis*used) the assets or income. *See Cofield*, 215 F.3d at 168 (offering examples of an agent's wrongdoing that might subject him to liability). If the person happens to be a general partner of an entity against which judgment is entered, then the general liability principles of partnership law would normally subject that person to personal liability. If the person has a relationship to the owning entity such that, under normal principles, does not give rise to the person being vicariously liable for what the owning entity is liable for, then Section 1715z-4a requires some degree of culpability to impose liability on that person. *Cf. Cofield*, 215 F.3d at 168 ("[T]here must be some limits based on fault and causation on the notion of agent liability--surely, the purchasing agent cannot be held liable, although an agent of the project, if unbeknownst to him an officer walks off with project rents . . . .").

As applied to the instant case, HUD points to no evidence, and we have found none in the record, that Ungerleider ever received any funds from the project, that she ever had control over any entity involved with the project, or that she was aware

---

[14]The statute further authorizes the district court to grant judgment in an amount doubling the value of the assets and income that were misused. 12 U.S.C. § 1715z-4a(c).

24

of any improper disbursements. Ungerleider cannot be held personally liable for any amount absent evidence of personal culpability. HUD, which would have the burden of proof at trial, had the summary judgment burden of putting forth some evidence that Ungerleider misused or received project funds. HUD has not met this burden. We render judgment with respect to defendant Ungerleider and hold that she may not be held personally liable for any part of the judgment because HUD has not produced any evidence that Ungerleider misused any funds.

With regard to Corbeille, the appellants admit that Corbeille received a total of $24,406.12 from project funds. The appellants assert that $22,500 of this sum was salary for 1992[15] and that $1,906.16 was for reimbursement of expenses. The final audit report found that "[t]he owner [i.e., Benson] paid herself and two partners $367,500 in unauthorized salaries" and that Benson "disbursed $424,024 for owner-related loans, legal fees, and other owner-related or unnecessary expenses in violation of the Regulatory Agreement and other HUD requirements." There is a genuine issue of material fact as to whether any or all of the $24,406.12 that Corbeille received was an improper use of project funds. Based on our understanding of Section 1715z-4a, we give

_____

[15]In her deposition, Corbeille testified that she was employed full-time at Heritage Village as activities director at a salary of slightly over $2,000 per month. The audit report indicates that the $22,500 was disbursed to Corbeille in five installments of $4,500 each between April 8, 1992 and December 15, 1992.

the following direction to the district court: The highest amount for which Corbeille is potentially personally liable is $48,812.24 (that is, double $24,406.12, the maximum amount of assets and income that Corbeille could have misused). Corbeille can only face liability based on funds that she misused (as misuse of funds is described in Section 1715z-4a). Thus, Corbeille's liability may ultimately be premised on the entire $24,406.12, a portion of it, or there may be no personal liability at all if there is no showing that the funds were used improperly. Of course, if HUD's suit was time-barred, there could be no personal liability.

## Conclusion

We REVERSE and RENDER judgment with respect to defendant-appellant Ungerleider with respect to her individual liability. HUD was required to produce evidence that Ungerleider misused or received project funds and no such evidence was produced. No substantial evidence contradicts the stipulation establishing that Ungerleider was not a general partner of RSG and she cannot be held personally liable on that basis.

We VACATE the judgment with respect to each of the defendants-appellants other than Ungerleider and REMAND that portion of the case for further proceedings not inconsistent with this opinion. Genuine issues of material fact remain as to whether the draft audit report was issued on June 17, 1993 or

26

before that date and whether HUD had sufficient knowledge to start the limitations period running even before the draft audit report was issued.  Genuine issues of material fact also remain as to whether defendant-appellant Corbeille made any misuse of project funds that would render her personally liable.

REVERSED and RENDERED in part;

VACATED and REMANDED in part.